1

2

3

4

5

6

7

8            IN THE UNITED STATES DISTRICT COURT

9           FOR THE EASTERN DISTRICT OF CALIFORNIA

10   THOMAS EUGENE SAUNDERS,

11            Petitioner,                    No. CIV S-06-734 MCE CHS P

12        vs.

13   TOM L. CAREY,

14            Respondent.        FINDINGS AND RECOMMENDATIONS

15   _____/

16                          I.  INTRODUCTION

17            Petitioner Thomas Eugene Saunders is a state prisoner proceeding pro se with a

18   petition for writ of habeas corpus pursuant to 28 U.S.C. §2254.  Saunders is currently serving a

19   sentence of 15 years to life following his 1988 conviction for second degree murder in the Colusa

20   County Superior Court.  (Exhibit 1.[1])  Saunders does not challenge the propriety of his

21   conviction; rather, he challenges the Governor's 2004 reversal of the Board of Parole Hearing's

22   decision finding him suitable for parole.  The petition and exhibits, respondent's opposition, and

23   applicable law have been carefully reviewed.  For the reasons that follow, Saunders is entitled to

24   relief on his claim because the Governor's reversal violated his due process rights.

25   _____

26        [1] All citations to exhibits refer to the exhibits submitted with Respondent's Answer
     (6/1/07).

## II.  FACTUAL AND PROCEDURAL BACKGROUND

Saunders killed Marvin Shuman, who was having an affair with his wife.  One night, while intoxicated, Saunders went to Shuman's home.  He knocked at the door but no one answered.  Noticing an open window, Saunders crawled into Shuman's home.  Once inside, a fight ensued.  At some point, Saunders obtained a baseball bat.  Saunders beat Shuman with the bat approximately 47 times and stabbed him three times.  Saunders returned to his home, leaving Shuman lying on the floor.  The next morning, he made an anonymous call to law enforcement reporting suspicious activity at Shuman's home.  Saunders later stated that he made the call because he was not sure whether the incident was real or a dream.  (Exhibit 2; Petition at 6; Answer at 2.)

Saunders pleaded guilty to one count of second degree murder and received a sentence of 15 years to life with the possibility of parole.  (Exhibit 1.)  His term began on March 10, 1988.  (Exhibit 9b at 1.)  On October 17, 2003, at his third subsequent parole suitability hearing, a panel of the Board of Prison Terms (hereinafter "Board") found him suitable for parole.  (Exhibit 9b.)  On March 15, 2004, Governor Schwarzenegger invoked his authority pursuant to article V, section 8, subdivision (b) of the California Constitution,  reversing the grant of parole.  In a written decision, the Governor indicated that his reversal was based on Saunders' commitment offense, social history, prior violent conviction, and unrealistic parole plans.  (Exhibit 4.)

Saunders filed a petition for writ of habeas corpus in the Colusa County Superior Court.  (Exhibit 5.)  The superior court upheld the Governor's reversal, stating in a brief written decision, without any analysis, that some evidence in the record supported the reversal.  (Exhibit 6.)  Saunders filed subsequent petitions in the California Court of Appeals, Third District, and in the California Supreme Court.  (Exhibits 7, 9a.)  Both subsequent petitions were denied without written opinion.  (Exhibits 8, 10.)

/////

1          III.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

2              An application for writ of habeas corpus by a person in custody under judgment of

3 a state court can be granted only for violations of the Constitution or laws of the United States.

4 28 U.S.C. §2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v.*

5 *Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (*citing Engle v. Isaac*, 456 U.S. 107, 119 (1982)).

6 This petition for writ of habeas corpus was filed after the effective date of, and thus is subject to,

7 the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *Lindh v. Murphy*, 521

8 U.S. 320, 326 (1997); *see also Weaver v. Thompson*, 197 F.3d 359 (9th Cir. 1999).  Under

9 AEDPA, federal habeas corpus relief also is not available for any claim decided on the merits in

10 state court proceedings unless the state court's adjudication of the claim:

11            (1) resulted in a decision that was contrary to, or involved an
              unreasonable application of, clearly established Federal law, as
12            determined by the Supreme Court of the United States; or

13            (2) resulted in a decision that was based on an unreasonable
              determination of the facts in light of the evidence presented in the
14            State court proceeding.

15 28 U.S.C. § 2254(d); *see also Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v.*

16 *Taylor*, 529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001).

17              IV.  ANALYSIS OF THE PETITION

18 A.       Due Process and Parole

19              The Due Process Clause of the Fourteenth Amendment prohibits state action that

20 deprives a person of life, liberty, or property without due process of law.  A person alleging a due

21 process violation must first demonstrate that he or she was deprived of a protected liberty or

22 property interest, and then show that the procedures attendant upon the deprivation were not

23 constitutionally sufficient. *Kentucky Dep't. of Corrections v. Thompson*, 490 U.S. 454, 459-60

24 (1989); *McQuillion v. Duncan*, 306 F.3d 895, 900 (9th Cir. 2002).

25              A protected liberty interest may arise from either the Due Process Clause or from

26 state laws. *Board of Pardons v. Allen*, 482 U.S. 369, 373 (1987).  The United States Constitution

1  does not, in and of itself, create a protected liberty interest in a parole date. *Jago v. Van Curen*,

2  454 U.S. 14, 17-21 (1981).  However, where a state's statutory scheme uses mandatory language,

3  it "'creates a presumption that parole release will be granted' when or unless certain designated

4  findings are made, and thereby gives rise to a constitutional liberty interest." *McQuillion*, 306

5  F.3d at 901 (*quoting Greenholtz v. Inmates of Nebraska Penal*, 442 U.S. 1, 12 (1979)).

6         The Ninth Circuit has conclusively determined that California state prisoners who

7  have been sentenced to prison with the possibility of parole have "a constitutionally protected

8  liberty interest in the receipt of a parole release date." *Irons v. Carey*, 505 F.3d 846, 850-51 (9th

9  Cir. 2007) (*citing Sass v. Cal. Bd. of Prison Terms*, 461 F.3d 1123, 1128 (9th Cir. 2006); *Biggs v.

10  Terhune*, 334 F.3d 910, 914 (9th Cir. 2003); *McQuillion*, 306 F.3d at 903; and *Allen*, 482 U.S. at

11  377-78 *(quoting Greenholtz*, 442 U.S. at 12)).  Thus, the issue for consideration is whether

12  Saunders was afforded adequate procedural protections before being deprived of his parole

13  release date.

14  B.      "Some Evidence" Standard

15         The full panoply of rights afforded a defendant in a criminal proceeding is not

16  constitutionally mandated in the context of a parole proceeding.  *See Pedro v. Or. Parole Bd.*,

17  825 F.2d 1396, 1398-99 (9th Cir. 1987).  The Supreme Court has held that a parole board's

18  procedures are constitutionally adequate if the inmate is given an opportunity to be heard and a

19  decision informing him of the reasons he did not qualify for parole.  *Greenholtz*, 442 U.S. at 16.

20  In addition to the *Greenholtz* protections, the Ninth Circuit has held that some evidence must

21  support a parole decision.  *Sass*, 461 F.3d at 1128-29; *McQuillion*, 306 F.3d at 904.

22         Saunders does not contest that he received notice of his 2003 parole hearing, an

23  opportunity to appear, and copies of the decisions rendered by the Board and Governor.  The only

24  remaining issue is whether there was some evidence to support the Governor's reversal.

25         Under the some evidence standard, a decision cannot be "without support" or

26  "arbitrary."  *McQuillion*, 306 F.3d at 904 (*citing Superintendent v. Hill*, 472 U.S. 445, 456

4

1  (1985)).  The some evidence standard is "minimally stringent," and a decision must be upheld if

2  there is any evidence in the record that could support the conclusion reached.  *Powell v. Gomez*,

3  33 F.3d at 40 (*citing Cato v. Rushen*, 824 F.2d 703, 705 (9th Cir. 1987)); *Toussaint v. McCarthy*,

4  801 F.2d 1080, 1105 (9th Cir. 1986).  The evidence supporting the decision must have "some

5  indicia of reliability."  *Biggs*, 334 F.3d at 915; *see also Jancsek v. Oregon Bd. Of Parole*, 833

6  F.2d 1389, 1390 (9th Cir. 1987).  Determining whether this standard is satisfied does not require

7  examination of the entire record.  *Toussaint*, 801 F.2d at 1105.  The Supreme Court has

8  specifically directed reviewing courts not to assess the credibility of witnesses or re-weigh the

9  evidence.  *Hill*, 472 U.S. at 455.  The only relevant question is whether there is *any* reliable

10  evidence in the record that could support the decision reached.  *See Id.*; *Toussaint*, 801 F.2d at

11  1105.

12          Saunders has listed the factors and circumstances that allegedly show his

13  suitability for parole.  (Petition at Points and Authorities, 20-23.)  This court is precluded by the

14  some evidence standard of review from comparing and contrasting the evidence in favor of

15  parole suitability and the evidence disfavoring parole suitability in order to decide this case.  *See*

16  *Hill*, 472 U.S. at 455.  The task at hand is limited to determining whether there is at least one

17  piece of evidence to support the state court's decision upholding the Governor's reversal.

18  C.      California Law on Parole Suitability Determinations

19          In evaluating whether the Governor's reversal of the Board's suitability decision

20  was supported by some evidence, the analysis "is framed by the statutes and regulations

21  governing parole suitability determinations in the relevant state."  *Irons*, 505 F.3d at 851.  The

22  court "must look to California law to determine the findings that are necessary to deem [a

23  petitioner] unsuitable for parole, and then must review the record to determine whether the state

24  court decision holding that these findings were supported by 'some evidence' [ ] constituted an

25  unreasonable application of the 'some evidence' principle."  *Id.*

26          Title 15, Section 2402 of the California Code of Regulations sets forth factors to

be considered by the Board regarding parole suitability findings for convicted murderers whose offense was committed on or after November 8, 1978.  The regulation is designed to guide the Board's assessment of whether the inmate poses "an unreasonable risk of danger to society if released from prison," and thus whether he or she is suitable for parole.  *In re Lawrence*, 44 Cal.4th 1181, 1214, 1202 (2008).  The regulation lists various circumstances that may tend to show  suitability or unsuitability for parole.  Cal. Code Regs. tit. 15, § 2402 (c) and (d).

Circumstances that may tend to show unsuitability for release are as follows: (1) the offense was committed in an especially heinous, atrocious, or cruel manner; (2) previous record of violence; (3) unstable social history; (4) the crime was a sadistic sexual offense; (5) lengthy history of severe mental problems related to the offense; and (6) serious misconduct in prison.  Cal. Code Regs. tit. 15, §2402(c).  Circumstances that may tend to show suitability for parole are set forth as follows: (1) no juvenile record; (2) stable social history; (3) signs of remorse; (4) significant stress as a motivation for the crime; (5) battered woman syndrome; (6) lack of criminal history; (7) age; (8) understanding and plans for future; (9) positive institutional behavior.  Cal. Code Regs. tit. 15, §2402(d).

The overriding concern in determining parole suitability is public safety and the focus is on the inmate's *current* dangerousness.  *In re Lawrence*, 44 Cal. 4th at 1205.  Thus, "the proper articulation of the standard of review is whether there exists 'some evidence' that an inmate poses a current threat to public safety, rather than merely some evidence of the existence of a statutory unsuitability factor."  *In re Lawrence*, 44 Cal.4th at 1254.

D.      Individual Factors Relied upon by the Governor

According to the Governor's written decision, reversal of the Board's parole grant was based on Saunders' commitment offense, unstable social history, prior violent conviction, and unrealistic parole plans.  (Exhibit 4.)  The Governor concluded that Saunders' commitment offense was especially cruel because of the pain and suffering Shuman must have experienced when Saunders hit him with the baseball bat approximately 47 times and stabbed him three

1    times.  (Exhibit 4.)  The Governor noted that Saunders' demonstrated an exceptionally callous

2    disregard for human suffering, and that jealousy and intoxication were trivial motives for beating

3    someone to death.  (Exhibit 4.)  The Governor, unlike the Board, also concluded that Saunders'

4    early and repeated alcohol abuse, troubled childhood, failed marriages, and "half-hearted

5    attempts at working" demonstrated an unstable social history.  (Exhibit 4.)  In addition, the

6    Governor concluded that Saunders' failure to secure a job offer demonstrated his lack of realistic

7    plans for the future because a job would be a critical tool to prevent him from drinking, which

8    has twice been linked to violent criminal conduct.  (Exhibit 4.)  In 1983, as the Governor noted,

9    Saunders was convicted of willful cruelty to a child after he hit his nine year old stepson while

10   intoxicated, leaving marks on the child's face.  (Exhibit 4.)

11              1.    Commitment Offense

12              Although the focus under California law is the current dangerousness of the

13   inmate, the gravity of the commitment offense alone can be a sufficient basis for denying parole

14   where the facts are especially heinous or particularly egregious.  *In re Rosenkrantz*, 29 Cal.4th

15   616, 682 (2002); s*ee also Biggs v. Terhune*, 334 F.3d 910, 913-16 (9th Cir. 2003); *Sass v. Cal.

16   Bd. of Prison Terms*, 461 F.3d 1123, 1126 (9th Cir. 2006); *Irons v. Carey*, 505 F.3d 846, 852-53

17   (9th Cir. 2007).[2]  There must, however, be some rational nexus between the facts of the

18   commitment offense relied upon and the ultimate conclusion that the prisoner continues to be a

19   threat to public safety.  *In re Lawrence*, 44 Cal.4th at 1214, 1227 ("the aggravated nature of the

20   crime does not in and of itself provide some evidence of *current* dangerousness to the public

21   unless the record also establishes that something in the prisoner's pre- or post-incarceration

22   _____

23              [2]In another case, *Hayward v. Marshall* (512 F.3d 536, 546-47 (9th Cir. 2008), a panel of
     the Ninth Circuit determined that under the "unusual circumstances" of that case, the unchanging
24   factor of the gravity of the petitioner's commitment offense did not, by itself, constitute some
     evidence supporting the governor's decision to reverse a parole grant on the basis that the
25   petitioner would pose a continuing danger to society.  However, on May 16, 2008, the Court of
     Appeals vacated the decision in order to rehear it en banc.  *Hayward v. Marshall*, 527 F.3d 797
26   (9th Cir. 2008).  Therefore, the panel decision in *Hayward* is no longer citable precedent.

1   history, or [ ] current demeanor and mental state, indicates that the implications regarding the

2   prisoner's dangerousness that derive from his or her commission of the commitment offense

3   remain probative to the statutory determination of a continuing threat to public safety")

4   (emphasis in original); *see also Irons*, 505 F.3d at 853-54 (repeated denial based solely on an

5   inmate's commitment offense "will at some point violate due process" where there is evidence of

6   rehabilitation and the prisoner has served the minimum term on his sentence).

7           Under the relevant regulation, the circumstances that support a finding that the

8   prisoner committed the offense in an especially heinous or cruel  manner are that (A) multiple

9   victims were attacked, injured or killed; (B) the offense was carried out in a dispassionate and

10  calcuated manner, such as an execution-style murder; (C) the victim was abused, defiled or

11  mutilated; (D) the offense was carried out in a manner which demonstrates an exceptionally

12  callous disregard for human suffering;  and (E) the motive for the crime is inexplicable or very

13  trivial in relation to the offense."  Cal. Code Regs. tit. 15 §2402 (c)(1)(A)- (E).  The relevant

14  inquiry is an individualized one: "whether the circumstances of the commitment offense, when

15  considered in light of other facts in the record, are such that they continue to be predictive of

16  current dangerousness many years after commission of the offense."  *In re Lawrence*, 44 Cal.4th

17  at 1221.  The passage of time and attendant changes in the inmate's psychological or mental

18  attitude are relevant considerations.  *Id*.

19          In finding that Saunders committed his offense in an especially heinous, atrocious

20  or cruel manner under section 2402, the Governor noted that Saunders displayed a callous

21  disregard for his victim's pain and suffering, and also that the motives for the crime (jealousy and

22  intoxication) were trivial in relation to its severity.  (Exhibit 4.)  Indeed, Saunders hit Shuman

23  with the baseball bat 47 times and stabbed him three times before returning home and going to

24  bed as if nothing had happened.  (Exhibit 2 at 24-25.)  The facts and circumstances of the

25  offense, however, considered in light of the full record, do not support the ultimate conclusion

26  that Saunders *continues* to pose an unreasonable risk to public safety.  As determined by the

1    Board in granting him parole,

2             [Saunders] has recently maintained positive institutional behavior,
         which indicates significant improvement in self-control.  Basically
3         no 115's.  Only (indiscernable)  in his entirety, except for one in
         1989; shortly after being incarcerated.  The prisoner has shown
4         signs of remorse.  He has indicated that he understands the nature
         and magnitude of the-- of the offense and accepts responsibility for
5         the criminal behavior, and has a desire to change towards good
         citizenship.  The psychosocial report or psychosocial factors start
6         with Doctor Dean Clair, PhD., Forensic psychologist.  And this
         was written April the 13th of 2001. [ ]  Appears to be supportive of
7         release.  As well as Doctor Robert E. Wagner, Clinical
         Psychologist, PhD.-- on a-- October 20-- 12th, 1999, psychosocial
8         factor report also appears to be supportive.  Doctor Wagner writes
         under conclusions that the prisoner is likely to remain on the same
9         stable path he has been on, whether he remains in prison or on
         parole.

10

11   (Exhibit 9b at 51-52.)  Further, in the 2001 psychological evaluation, which was the most recent

12   available, Dr. Clair wrote that Saunders turned things around during his incarceration and

13            put together a history of work, learning, and self-control.  He has
         steadily attended AA and has completed several self-help
14        programs.  How he could have been responsible for his
         commitment offense remains inexplicable, apart from a possible
15        dis-inhibition while intoxicated.  He is now at minimal risk of
         resuming substance abuse and a minimal risk of being in any way
16        dangerous.

17   (Exhibit 9b at 32.)

18            The Governor considered the circumstances of Saunders' commitment offense,

19   but failed to consider them in light of other facts in the record as recited above.  There is no

20   rational nexus between the facts of the commitment offense relied upon by the Governor and his

21   ultimate conclusion that Saunders continues to remain a threat to public safety.

22            First, the fact that Saunders' motives to kill Shuman were trivial is not reliable

23   evidence that he remains unsuitable for parole.  A finding of "triviality" sufficient to justify the

24   denial of parole must somehow relate to present dangerousness.  *See In re Scott*, 119 Cal.App.4th

25   871, 893 (2004).  Moreover, in order to fit the regulatory description, the prisoner's motive must

26   be more trivial than those which conventionally drive people to commit the offense in question.

1  *See Id.* (reasoning that all motives for murder could reasonably be deemed "trivial").  Although

2  jealousy and intoxication are trivial motives to kill a person, they are not more trivial than those

3  which conventionally drive people to commit second degree murder.  There is no evidence that

4  Saunders poses a current risk of threat to public safety based on the trivial motives for his

5  offense.

6          The other factor cited by the Governor in finding the offense to be especially

7  heinous, atrocious or cruel was Saunders' callous disregard to human suffering.  Saunders'

8  actions certainly showed callous disregard to the pain and suffering Shuman must have

9  experienced during the attack.  Again though, the relevant question is whether there are

10  additional circumstances in Saunders' history, either before or during incarceration, which

11  indicate that his callousness in committing this offense is still probative to the statutory

12  determination of his current dangerousness.  *See In re Lawrence*, 44 Cal.4th at 1227.  As the

13  Governor noted, Saunders has remained "relatively disciplinary-free" while in prison.  (Exhibit

14  4.)  In addition, it was noted in his psychiatric report that "he has great remorse, saying he cannot

15  understand how he could have done such an act, running over and over again in his head how he

16  might have done things differently."  (Exhibit 9b at Clair Psychiatric Report.)

17          Shuman's murder was a serious crime and deserving of the prison sentence

18  imposed on Saunders.  The circumstances of the murder were not, however, "especially heinous,

19  atrocious, or cruel" such that they continue to be predictive of Saunders' current dangerousness

20  this many years after commission of the offense, given the other facts in the record demonstrating

21  significant rehabilitation and changes in his psychological and mental attitude.  *See In re*

22  *Lawrence*, 44 Cal.4th at 1221.

23          The Governor appeared to find Saunders' alcoholism and the role that alcohol

24  played in the crime "significant."  (Exhibit 4.)  Saunders' past alcohol abuse is not a sufficient

25  nexus between the facts of the commitment offense and the ultimate conclusion that he continues

26  to remain a threat to public safety.  Rather, there is undisputed evidence that he will not resume

1    his old drinking habits.  Saunders has continuously participated in AA since 1989.  (Exhibit 4.)

2    Dr. Clair wrote that he was "at minimal risk for resuming substance abuse and at minimal risk of

3    being dangerous in any way," and Dr. Wagner indicated that he is likely to remain on the same

4    stable path he has been on, whether in prison or on parole.  (Exhibit 9b at 32, 51-52.)  A

5    determination that Saunders is currently dangerous and unsuitable for parole simply because he

6    *might* resume drinking and become violent is purely speculative, and unsupported by reliable

7    evidence in the record.  *Cf. In re Shaputis*, 44 Cal.4th 1241, 1259 (2008) (record supported the

8    Governor's determination that the crime was especially aggravated, *and*, importantly, that the

9    aggravated nature of the offense indicated that the petitioner still posed a current risk to public

10   safety, where the murder of his wife was the culmination of many years of violent and brutalizing

11   behavior toward the victim, his children, and his previous wife, and the psychological report

12   specifically qualified a finding of low risk of violence upon the petitioner's ability to avoid a

13   relapse into alcoholism.)

14          The role of the Governor was to conduct an individualized suitability

15   determination focusing on the public safety risk Saunders *currently* poses.  *Id*. at 1217, 1221.

16   There is no reliable evidence that the circumstances of Saunders' commitment offense remain

17   predictive of his current dangerousness, when considered in light of the undisputed evidence of

18   his rehabilitation and exemplary behavior in prison.  *See Id*. at 1217, 1221*; In re Elkins*, 144 Cal.

19   App. 4th 475, 498-99 (2006) ("[T]he commitment offense . . . is an unsuitability factor that is

20   immutable and whose predictive value 'may be very questionable after a long period of time.' . . .

21   Reliance on an immutable factor, without regard to or consideration of subsequent

22   circumstances, may be unfair, run contrary to the rehabilitative goals espoused by the prison

23   system, and result in a due process violation.") (internal citations omitted).

24          It therefore appears that the Governor's findings concerning factors related to the

25   commitment offense are not supported by some evidence.

26   /////

2.      Previous Record of Violence

Under the relevant regulation, a prisoner's "previous record of violence" is a circumstance that may tend to indicate unsuitability for parole.  Cal. Code Regs. tit. 15 §2402(c)(2).  Along with the circumstances of the commitment offense, this is the only other factor of unsuitability a prisoner can never change.  *In re Scott*, 133 Cal.App.4th 573, 594 (1st Dist. 2005).  Thus, a previous record of violence properly negates parole suitability only where the circumstances of the prisoner's record rationally indicate that he will still present an unreasonable public safety risk if released from prison.  *See In re Lawrence*, 44 Cal.4th at 1217, 1221.

Under California law, a previous record of violence may tend to show unsuitability for parole where "[t]he prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age."  *Id*.  There is no evidence that Saunders demonstrated serious assaultive behavior at an early age.  He does, however, have a single prior misdemeanor conviction for willful cruelty to a child, sustained after he struck his nine year old stepson twice in the face.  (Exhibit 2, 4.)  Saunders has stated that the incident occurred during a "black-out period" when he was drinking heavily.  (Exhibit 4.)

In citing Saunders' previous record of violence as a factor demonstrating unsuitability, the Governor found it "significant" and "troubling" that his offense against his stepson and his commitment offense both involved the use of alcohol.  The Governor's reasoning implies a finding that Saunders would start drinking alcohol again and become violent if released from prison.  The record, however, does not contain any evidence to support reasonable grounds to believe that Saunders, if released, would start drinking alcohol again and become violent.  *Cf. In re Shaputis*, 44 Cal.4th at 1251, 1259 (petitioner's alcoholism considered along with other circumstances in affirming Governor's reversal of parole grant where the petitioner had a history of alcohol abuse that was closely associated with an extensive history of extreme domestic

12

violence, and where there was evidence that the petitioner premeditated his offense yet continued to assert that it was an accident).  Nor does the record support a reasonable belief that further treatment in prison would aid Saunders in abstaining from alcohol and resisting violence in the future.  The Governor failed to consider in his decision the undisputed evidence that was inconsistent with such a finding.  For example, Saunders' prison classification score is 19, the lowest possible score for his life crime.  (Exhibit 4 at 22.)  He has continuously participated in AA since 1989.  (Exhibit 4.)  Dr. Clair wrote that he  was "at minimal risk for resuming substance abuse and at minimal risk of being dangerous in any way," and Dr. Wagner indicated that he is likely to remain on the same stable path he has been on, whether in prison or on parole.  (Exhibit 9b at 32.)

Regardless of the Governor's observations on Saunders' record of violence in relation to his use of alcohol, there is no evidence that Saunders has "on previous occasions inflicted or attempted to inflict serious injury on a victim."  The word "serious" in this context is defined as "[g]rave in character, quality, or manner."  American Heritage Dict. (2d College Ed. 1976) p. 1120).  There is little evidence in the record regarding the extent of injury to Saunders' stepson, other than that he sustained "bruising on both cheeks and swelling to the right side of [the] face."  (Exhibit 2 at 6.)  While the infliction of bruising or swelling on a child's face is certainly a grave and serious matter, there is no evidence in the record that the swelling and bruising was itself grave or serious.  Bruising and swelling is simply not a "serious injury" as the term is commonly understood.  Indeed, the probation report characterized the violence demonstrated in the offense as "minimal."  (Exhibit 2 at 25.)

In sum, there is no reliable evidence that Saunders has "on previous *occasions* inflicted or attempted to inflict *serious injury* on a victim," or that he demonstrated assaultive behavior at an early age, or that the circumstances of his previous misdemeanor offense rationally indicate the he remains currently dangerous.  The Governor's finding regarding Saunders' previous record of violence is not supported by some evidence in the record.

3.     Social History

An unstable social history is a circumstance tending to indicate unsuitability for parole where "[t]he prisoner has a history of unstable or tumultuous relationships with others." Cal. Code Regs. tit. 15 §2402(c)(3).

In its decision to grant parole to Saunders, the Board stated that he had a stable social history, as exhibited by his reasonably stable personal relationships and his lack of a significant criminal history. (Exhibit 9b at 50.)  In contrast, the Governor found that Saunders' unstable social history made him unsuitable for parole:

> Mr. Saunders and his siblings were removed from their parents' custody after it was determined that they were not being cared for properly.  He was placed in several foster homes and group homes during his youth.  He has stated that he began drinking alcohol at the age of 9 and by the age of 17 he was drinking on a regular basis with his younger brother.  When he was 17 years old, Mr. Saunders enrolled in the Job Corps, but was released after just two months for fighting with another trainee.  He then enlisted in the United States Navy, but received a medical discharge after a month because he was unable to adapt to the rigors of boot camp.  In 1972 Mr. Saunders married, separated from his wife several times, and finally divorced in 1974.  He married another woman in 1979, but they divorced after he was sent to prison.  Mr. Saunders' social history is anything but stable.  He was separated from his parents and siblings as a youth, was divorced twice, and has a history of drinking and fighting.  The Board's finding of stable social history is not supported by the facts.

(Exhibit 4.)

During the hearing, Saunders testified that his father was deceased.  (Exhibit 9b at 16.)  His mother, who was still living, had submitted a letter of support indicating that she would help Saunders, if paroled, with housing, money, and transportation.  (Exhibit 9b at 34.)  Saunders testified that he corresponds regularly with his mother and one sister.  (Exhibit 9b at 16.)  It appears that Saunders does not regularly correspond with seven other siblings.  (Exhibit 9b at 16.)  Although the record is far from clear, he indicated that some of them have substance abuse

1   issues which may be a reason for the lack of contact.[3]  (Exhibit 9b at 16.)

2          Saunders testified that he and his older brother were removed from his parents'

3   care when he was 8 because there was no electricity in the home.  (Exhibit 9b at 17.)  He was

4   moved around several more times as a child.  (Exhibit 9b at 18.)  He has been married and

5   divorced twice.  (Exhibit 9b at 19-20.)  He and his second wife had a son in 1978.  (Exhibit 9b at

6   19-20.)  Saunders testified that he has a close relationship with his son, who is his only child.

7   (Exhibit 9b at 20-21.)  His son and his son's fiancé both submitted letters of support to the Board

8   on his behalf.  (Exhibit 9b at 20, 37.)  Although Saunders and his second wife divorced shortly

9   after he entered prison, they still have a friendly relationship and he testified that she visits him in

10  prison.  (Exhibit 9b at 39-40.)  She and her aunt both submitted letters of support for his release.

11  (Exhibit 9b at 37-38.)  His second wife's aunt also indicated that she would provide support in

12  any way she could, including money, room, food, transportation, etc.  (Exhibit 9b at 38.)

13         The Governor cites Saunders' history of drinking and his short stints in both the

14  Job Corps and United States Navy as evidence of his unstable social history.  Neither alcohol

15

16         [3] The lack of clarity regarding Saunders' relationships with his siblings is due, in part, to
    significant gaps in the hearing transcript at pages 16-17:
17
    Saunders: All my brothers and sisters (indiscernible).
18  Presiding Commissioner: Yeah.  But the relationship-- they're doing okay?
    Saunders: Yeah, my mother and my one sister, I (indiscernible) all the time.  The rest of them
19  (indiscernible) me.  You know (indiscernible) the other ones, one is out of state and I write to
    him but he never writes back.
20  Presiding Commissioner: Writes you back.
    Saunders: No, and (indiscernible) heading the same way I was.
21  Presiding Commissioner: He's an alcoholic too, huh?
    Saunders: Yeah.  (Indiscernible) two -- two of us went (indiscernible) two of my other brothers
22  are sober today.  One that's older than me, (indiscernible) drinks.
    Presiding Commissioner: All right.
23  Saunders:   (Indiscernible) one sister, she's an alcoholic.  I told my mom to (indiscernible) talk
    to her (indiscernible) get out and (indiscernible) try to (indiscernible) and I want to
24  (indiscernible).
    Presiding Commissioner: So you only have two or three, I think.
25  Saunders: Yeah.
    Presiding Commissioner: You mentioned that don't drink.
26  Saunders: Yes.

1  abuse nor one's employment history, however, are listed in the regulation as relevant for the

2  consideration of a prisoner's social history.[4]  Cal. Code Regs. tit. 15 § 2402(c)(3) (rather, the only

3  factor listed for consideration is that "[t]he prisoner has a history of unstable or tumultuous

4  relationships with others.")

5          The Governor did not explain how Saunders' removal from his parents home as a

6  child, due to their lack of electricity, is evidence of an unstable relationship.  Saunders still has a

7  good relationship with his mother, his only living parent, who offered him a place to stay if

8  paroled.  Nor is his placement in various foster or group homes as a youth reliable evidence that

9  he had tumultuous relationships.  Similarly, Saunders' two divorces may or may not have

10  resulted from unstable or tumultuous relationships.  His continuing friendship with his second

11  wife, which ended in divorce shortly after he entered prison, cannot be characterized as unstable

12  or tumultuous since she visits him in prison, wrote a letter of support on his behalf, and offered

13  to let him reside with her if paroled.  Importantly, there is no reliable evidence that any of the so-

14

15          [4] Alcohol abuse and employment history may, however, properly be considered as "other relevant, reliable information" under §2402(b), which reads:

16  Information Considered.  All relevant, reliable information available to the panel shall be considered in determining suitability for parole.  Such information shall include the

17  circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and

18  other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of

19  special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release....

20

21  Although Saunders' alcohol abuse and employment history would be properly considered under the foregoing section, there is no reliable evidence in the record that these factors continue to be

22  indicative in any way of his current dangerousness.  Rather, undisputed evidence in the record as set forth elsewhere herein indicated that he was "at minimal risk for resuming substance abuse,"

23  that he had received many positive reports concerning his work efforts in prison, and that he was "likely to remain on a stable path if paroled."

24  The Board included, as a special condition of Saunders' parole, that he abstain from alcohol,

25  submit to alcohol testing, and participate in substance abuse programs such as AA.  (Exhibit 9b at 53.)  This relevant, reliable information must also be considered.

26

1 | called unstable or tumultuous relationships in Saunders' troubled past are indicative of some

2 | degree of current dangerousness.  *See In re Lawrence*, 44 Cal.4th at 1205 ("the core

3 | determination of 'public safety' under the statute and corresponding regulations involves an

4 | assessment of an inmate's *current* dangerousness").  To the contrary, undisputed evidence in the

5 | record demonstrates that his relationships with his ex-wife and mother, in addition to other

6 | relatives, are *currently* stable.

7 |       In sum, there is no reliable evidence in the record that Saunders has a history of

8 | unstable or tumultuous relationships that would be indicative of his current dangerousness.

9 |       4.    Parole Plans

10 |       The final factor cited by the Governor in reversing the Board's grant of parole was

11 | that Saunders lacked a firm job offer.  (Exhibit 4.)  A prisoner's understanding and plans for the

12 | future, specifically where the prisoner "has made realistic plans for release or has developed

13 | marketable skills that can be put to use upon release," is a factor tending to indicate suitability for

14 | parole.  *See* Cal. Code Regs. §2402(d)(8).  There is no requirement that a formal job offer be

15 | obtained.  *See Id*.  The Governor acknowledged Saunders' extensive educational and vocational

16 | training, noting that he

17 |         obtained his high-school equivalency certificate and completed

18 |         vocational programs in small engine repair and welding.  He has

        received positive work reports from those who have supervised

19 |         him in his various positions.  Notably, he received laudatory

        reports for his work in the plumbing shop where he was described

20 |         as reliable, efficient, and self-motivated.

21 | (Exhibit 4.)  In addition, Saunders has received letters of commendation and positive supervisory

22 | reports for his ability to work in a kitchen area and in maintenance.  (Exhibit 9b at 23.)

23 | Nevertheless, the Governor concluded that

24 |         Mr. Saunders has shown that he can abstain from alcohol for a

        period of time, as he did after his child-abuse conviction.

25 |         Unfortunately, he has also shown that he can easily resume his

        drinking habit as he did after the probationary term for that

26 |         conviction.  I believe that it is much more likely that Mr. Saunders

> will once again return to drinking if he is paroled without a job.  I
> recognize that a job will not guarantee his abstinence from alcohol.
> I do, however, believe that a job would occupy his time, provide
> stability, and increase his chances of success outside of an
> institutional setting.

(Exhibit 4.)

Saunders has been a member of Alcoholics Anonymous since 1989.  (Exhibit 4.)
He indicated that he planned to continue his participation after parole, and brought to his Board
hearing a list of AA meetings in locations he could attend.  (Exhibit 9b at 47.)  Indeed, it is a
reasonable assumption that a steady job would be a useful tool to help him continue to refrain
from drinking.  At his October 17, 2003 parole hearing, Saunders testified that he had sent out
many resumes in search of employment, but had not been able to secure a job offer.  (Exhibit 9b
at 42.)  Saunders testified that he would accept a welding position, a position in small engine
repair, a job at a hardware store, a job washing cars, or *any type of work* that became available to
him.  (Exhibit 9b at 42.)  It is not surprising that Saunders has been unable to secure a firm offer
of employment given the fact that he is incarcerated, has no release date, and has no certainty of
*ever* being released.  Accordingly, the lack of a job offer does not, by itself, mean that he has not
made realistic plans for release.  *Hernandez v. Schwarzenegger*, No. 07-3427, Slip. Op. at 8
(N.D. Cal. January 5, 2009).

Saunders had offers to reside with his son, his mother, his ex-wife, and his ex-
wife's aunt.  (Exhibit 9b at 34-36, 38, 40.)  In addition, his mother and ex-wife both indicated in
their letters of support that they would be willing to assist him with transportation to a job or to
AA meetings.  (Exhibit 9b at 34, 41.)  Given his family support, trade skills, willingness to work,
positive work reports, and the affirmative efforts he made to find employment, the conclusion
that Saunders' parole plans were inadequate simply because he lacked a firm job offer is not
convincing.  The record contains no reliable evidence that Saunders lacks "understanding and
plans for the future."

/////

E.       Remaining Claims

Saunders additionally claims that the Governor's review of the Board's parole decision constitutes an ex post facto violation, and that the Governor has a blanket policy of denying parole to all convicted murderers without individualized consideration of the relevant factors.  While these additional claims are without merit, there appears no need to examine them herein given the determination that the Governor's reversal of Saunders' parole grant is not supported by some evidence in the record.

V.  CONCLUSION

The state court's determination that some evidence supported the reversal was unreasonable, in light of the evidence presented, and constituted a violation of Saunders' due process rights.

For the foregoing reasons, IT IS HEREBY RECOMMENDED that

(1)      Saunders's application for writ of habeas corpus be GRANTED; and

(2)      Respondents be directed to release Saunders from custody, within 10 days after any order adopting these findings and recommendations, in accordance with the October 17, 2003 decision of the Board of Prison Terms finding Saunders suitable for parole.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within ten days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

DATED: February 20, 2009

*Charlene H. Sorrentino*

CHARLENE H. SORRENTINO
UNITED STATES MAGISTRATE JUDGE

19